

**United States District Court**
NORTHERN DISTRICT OF GEORGIA

FILED IN CHAMBERS
U.S.D.C. Atlanta
AUG 14 2019
JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA
v.

Nathan Horton

CRIMINAL COMPLAINT
Case Number: 1:19-MJ-690

**UNDER SEAL**

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning in at least October 2016 and continuing until at least December 2017 in Clayton County, in the Northern District of Georgia and elsewhere, defendant: (a) violated the Lacey Act; (b) engaged in interstate transport and sale of stolen property; and (c) conspired to violate the foregoing criminal statutes,

in violation of Title 18, United States Code, Sections 371, 2314, 2315, and Title 16, United States Code, Section 3371(a)(2)(A).

I further state that I am a Resident Agent in Charge and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

_____
Signature of Complainant
John Elofson

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

August 14, 2019                    at    Atlanta, Georgia
Date                                      City and State

JANET F. KING
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer       Signature of Judicial Officer
AUSA Alex R. Sistla / 2017R00639

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, John Elofson, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND

1. I am a Resident Agent in Charge (RAC) with the United States Fish and Wildlife Service (FWS), Department of the Interior, supervising North Carolina, South Carolina, and Georgia enforcement activities, and have been so employed since August 2012. I currently work out of the Atlanta, Georgia field office. Prior to becoming a RAC, I was employed as Special Agent with FWS from April 1998 until my appointment as a RAC. Before joining FWS, I was a Wildlife Officer (Conservation Law Enforcement Officer) with the State of Florida for four years. I am also a retired Lieutenant Colonel in the United States Marine Corps Reserves. I received my Bachelor's Degree from Northeast Louisiana University in 1988 (Northeast Louisiana University was subsequently renamed University of Louisiana Monroe). During my employment with the FWS, I have conducted, participated in, and supervised investigations of violations of wildlife laws and have undergone training in the identification and investigation of wildlife crimes.

2. FWS and the Georgia Department of Natural Resources have been investigating the activities of **NATHAN HORTON** and others regarding the illegal harvest of freshwater turtles from the public waters of Georgia and the subsequent illegal sale and transport of these turtles in interstate commerce. Based on the facts alleged below, there is probable cause to believe that in the Northern District of Georgia and elsewhere, from at least October 2016 until December 2017, **HORTON** and others have conspired to violate the Lacey Act, transport stolen goods, and sell stolen goods, all in violation of 18 U.S.C. § 371, and has committed substantive violations of 18 U.S.C. § 2314

(transportation of stolen goods), 18 U.S.C § 2315 (sale or receipt of stolen goods), and 18 U.S.C. § 3372(a)(2)(A) (Lacey Act violation). I am submitting this affidavit in support of a criminal complaint.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, State officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## RELEVANT STATUTES AND REGULATIONS

4. Title 18, United States Code, Section 371, entitled "Attempt and conspiracy," states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both..

18 U.S.C. § 371.

5. Title 18, United States Code, Section 2314, entitled "Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting," states in relevant part:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 2314.

6. Title 18, United States Code, Section 2315, entitled "Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps," states in relevant part:

> Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise . . . of the value of $5,000 or more . . . which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken . . . [s]hall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 2315.

7. The Lacey Act, *see* 16 U.S.C. §§ 3371–3378, makes it unlawful for one to import, export, sell, acquire, or purchase fish, wildlife or plants that are taken, possessed, transported, or sold in violation of U.S. or State law or regulation. Title 16, United States Code, Section 3372, entitled "Prohibited Acts" is a portion of the Lacey Act. Section (a) states in relevant part:

> . . . It is unlawful for any person-- (1) to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States . . . ; [or] (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce--(A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law[.]

16 U.S.C. § 3372(a). Criminal punishments for the Lacey Act are set forth in Title 16, United States Code, Section 3373, entitled "Penalties and sanctions." That statute states in relevant part:

> (1) Any person who--
> (A) knowingly imports or exports any fish or wildlife or plants in violation of any provision of this Act (other than subsections (b), (d), and (f) of section 3), or
> (B) violates any provision of this Act (other than subsections (b), (d), and (f) of section 3)) by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $ 350,
>   knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under,

Page 3 of 18

       any underlying law, treaty or regulation, shall be fined not more than
       $ 20,000, or imprisoned for not more than five years, or both.

16 U.S.C. § 3373(d).

    8. The FWS regulates the commercial import and export of wildlife in and out of the United States. In general, anyone engaging in such activity must hold a FWS Business license, which allows them to commercialize wildlife imports and exports. *See* 50 C.F.R. § 14.91. All wildlife imports and exports must be declared to the FWS at specific designated ports prior to import or export. *See* 50 C.F.R. §§ 14.11–12. A FWS Wildlife Export Declaration must be submitted to FWS prior to export of wildlife. *See* 50 C.F.R. § 14.63. FWS Wildlife Inspectors may inspect imports and exports to verify shipments accurately reflect the declaration and possess all necessary documentation. *See* 50 C.F.R. § 14.51.

    9. Title 27 of the Official Code of Georgia provides laws regarding game and fish in Georgia. Under Georgia law, wildlife on public lands belong to the State of Georgia:

> The ownership of, jurisdiction over, and control of all wildlife, as defined in this title [the Game and Fish Code], are declared to be in the State of Georgia, in its sovereign capacity, to be controlled, regulated, and disposed of in accordance with this title. Wildlife is held in trust by the state for the benefit of its citizens and shall not be reduced to private ownership except as specifically provided for in this title. All wildlife of the State of Georgia is declared to be within the custody of the department [Department of Natural Resources] for purposes of management and regulation in accordance with this title. However, the State of Georgia, the department, and the board [Board of Natural Resources] shall be immune from suit and shall not be liable for any damage to life, person, or property caused directly or indirectly by any wildlife.

O.C.G.A. § 27-1-3(b). Georgia law also provides that: "[a] person who takes any wildlife in violation of this title commits the offense of theft by taking." *Id.* § 27-1-3(i)."

10. The Georgia Department of Natural Resources (GA-DNR) regulates the collection and trade of freshwater turtles through a permit process, sales and export requirements, and limitations on the trapping of certain species. *See* O.C.G.A. § 27-3-19.1.

11. Under GA-DNR regulations, all commercial turtle collectors must obtain a Commercial Turtle Permit. A commercial turtle collector may only trap a certain number of turtles per year and must use legal methods of trapping, as defined by GA-DNR.

12. Under GA-DNR regulations, if a commercial turtle collector intends on exporting turtles outside Georgia, she must obtain a valid Turtle Export Permit from GA-DNR prior to exporting the turtles. In the Turtle Export Permit application, the applicant must state to whom and where she is exporting the turtles, provide accurate numbers and species of turtles to be exported, and list the date on which she intends to export the turtles. The Turtle Export Permit is only valid for the date listed on the permit and only for the number of turtles listed on the permit.

13. Under GA-DNR regulations, commercial turtle collectors must maintain and submit yearly records of their turtle collecting activity. There are limits to the number of turtles a person may lawfully export. A commercial turtle collector may not export the following species in numbers greater than the respective limits listed below on an annual basis (i.e., April 1-March 31):

| Species | Common Name | Limit |
|---|---|---|
| Apalone ferox | Florida Softshell Turtle | 100 |
| Apalone spinifera | Spiny Softshell Turtle | 100 |
| Chelydra serpentina | Common Snapping Turtle | 300 |
| Chrysemys picta | Painted Turtle | 300 |
| Kinosternon baurii | Striped Mud Turtle | 300 |
| Kinosternon subrubrum | Eastern Mud Turtle | 300 |
| Pseudemys concinna | River Cooter | 100 |
| Sternotherus minor | Loggerhead Musk Turtle | 300 |
| Sternotherus odoratus | Common Musk Turtle | 300 |
| Trachemys scripta | Pond Slider | 1,000 |

14. Under Georgia law, it is unlawful to:

   a. "make any false statement as to any fact which is required as a prerequisite to the issuance of a license or permit [pertaining to hunting, trapping or fishing]," O.C.G.A § 27-2-28(b);

   b. "make use of or possess any wildlife or parts thereof which he knows or reasonably should have known have been taken or possessed contrary to any wildlife laws, rules and regulations," O.C.G.A. § 27-1-31(a); and

   c. "export, farm, or sell any freshwater turtle or part thereof except in accordance with rules and regulations adopted by the [Board of Natural Resources]," O.C.G.A. § 27-3-19.1(a).

15. Georgia law also defines what constitutes a lawful turtle trap: "[T]urtle traps must be constructed of netting and shaped as hoop nets. The traps must also have one open muzzle or throat at least 32 inches wide with a ring ten inches in diameter made into the rear of the trap to permit fish to escape." O.C.G.A. § 27-4-91(c).

Page 6 of 18

## Georgia

## Legal Commercial Turtle Trap Example



## **PROBABLE CAUSE**

16. This case involves an investigation into the illegal harvest of freshwater turtles from the public waters of Georgia and the subsequent illegal sale and transport of these turtles in interstate commerce by **NATHAN HORTON**, (demo) (demo) and others. The conspirators have illegally trapped freshwater turtles beginning in at least October 2016 and continuing to at least December 2017 and illegally shipped the turtles from Georgia to California and then from California to China. The turtles were shipped to China through a California-based export company,

(demo) [1] The customs broker[2] for the international shipments was (demo) and shipment paperwork sometimes listed (demo) as the point of contact for the company.

17. On or about October 18, 2016, GA-DNR Cpl. Tony Wynne contacted **HORTON** and Richard Frank while **HORTON** and Frank were trapping turtles on Lake Jackson, a reservoir lake approximately 44 miles southeast of Atlanta, Georgia. **HORTON** told Cpl. Wynne that he was a commercial turtle collector and that he shipped his turtles to a buyer in California who exported them to China. During the contact, Cpl. Wynne inspected HORTON's turtle traps and informed him that they were illegal because the escape rings were too small. **HORTON** told Cpl. Wynne his traps had never been a problem in the past and if he increased the escape ring size, the smaller turtles would escape. **HORTON** told Cpl. Wynne that he had one thousand active turtle traps on Lake Jackson and stated that he would remove them by the next morning. Cpl. Wynne seized **HORTON's** two

---

[1] Based on my training and experience, I know that turtles are considered prized pets in China and can be sold in China for substantial profits. FWS data has shown, on average, a 500% mark-up on the price for wild turtles caught in the U.S. and sold in China, meaning that a single turtle can sell for hundreds of dollars. Here, bank records show that HORTON's Wells Fargo bank account ending in 4246 received at least $250,000 from (demo)

(demo) (demo)

(demo)

[2] A "customs broker" is a firm or individual licensed by U.S. Customs and Border Protection that handles compliance with trade and import/export laws and regulations for importer/exporter businesses. This sometimes includes preparation of FWS paperwork for import and export of wildlife.

illegal traps and issued violation notices to **HORTON** and Frank for violating O.C.G.A. § 27-4-91 (Trapping turtles with illegal nets).

18. On or about November 22, 2016, according to GA-DNR records, **HORTON** and Frank appeared in Butts County Probate Court and each paid a fine of $300.

19. On or about April 20, 2017, **HORTON** applied to GA-DNR to renew his Commercial Turtle Permit. The application lists **HORTON's** e-mail address as nhortonsr@gmail.com.

20. On or about May 23, 2017, GA-DNR received a Commercial Turtle Export Permit application from **HORTON**. On the application, **HORTON** listed his e-mail address as nhortonsr@gmail.com and stated that he was shipping turtles to (demo) (demo) via Southwest Airlines.

21. On or about May 30, 2017, GA-DNR received a Commercial Turtle Export Permit application from **HORTON**. On the application, **HORTON** listed his e-mail address as nhortonsr@gmail.com and stated that he was shipping turtles tc (demo) of (demo) via Southwest Airlines.

22. On or about June 7, 2017, GA-DNR received a Commercial Turtle Export Permit application from **HORTON**. On the application, **HORTON** listed his e-mail address as nhortonsr@gmail.com and stated that he was shipping turtles (demo) of (demo) (demo) via Southwest Airlines.

23. **HORTON** and (demo) are signing up other people to obtain Commercial Turtle Permits:

   a. On or about June 16, 2017, HORTON transported (demo) (demo) to the GA-DNR headquarters so that they could purchase

Rader Demo

Commercial Turtle Permits. (demo) application lists his e-mail address as (demo) Although both (demo) and (demo) sought permits, (demo) paid for both permits. A GA-DNR undercover officer was posing as another commercial turtle collector while (demo) were obtaining their permits. The officer asked (demo) if he was going to catch turtles (demo) eemed uninterested and replied, in substance: "No, I'm just here with this guy (pointing to (demo) )."

b. On or about June 19, 2017, HORTON transported (demo) (demo) to GA-DNR's headquarters so (demo) could purchase a Commercial Turtle Permit. (demo) paid for (demo) permit.

c. On or about July 7, 2017, GA-DNR received Commercial Turtle Export Permit applications purportedly from (demo) . The applications were sent from (demo) e-mail account, (demo) Both applications stated the turtles were being shipped to (demo) via Southwest Airlines.

Based on my training and experience, I believe that **HORTON** and (demo) are signing up other individuals for permits so that they can trap additional turtles beyond the turtle quota allowed for a single permitholder.

24. On or about July 9, 2017, according to Southwest Airlines records, a turtle shipment traveled from Atlanta Hartsfield-Jackson International Airport (ATL) to Los Angeles International Airport (LAX). **HORTON**'s name was listed as the sender on the

shipment. FWS records indicate an export of turtles occurred on July 9, 2017 from LAX to Guangzhou, China. The FWS export permit listed the U.S. exporter as (demo) with

(demo)

(demo)     The customs broker listed on the permit was  (demo)  with

(demo)

25. On or about August 11, 2017, law enforcement conducted an undercover meeting with **HORTON** during which **HORTON** purchased turtles that were illegally trapped. The meeting was audio and video recorded. Prior to the meeting, the turtles sold to **HORTON** had been tagged with passive integrated transponders (PIT-tagged) to allow for verification of identity via a scanning device. During the meeting:

   a. Undercover officers told **HORTON** that the turtles they had for sale had been illegally trapped.

   b. Undercover officers showed **HORTON** the illegal traps used to catch the turtles. **HORTON** acknowledged that the traps were illegal, but still purchased all 46 illegally trapped turtles from law enforcement for $520 cash.

   c. **HORTON** said that it was OK to use illegal traps because you would only get a small ticket—"like a speeding ticket"—if you get caught.

   d. **HORTON** explained that he was caught with illegal turtle traps by GA-DNR in 2016 and only had to pay a fine.

   e. **HORTON** explained the regulations for legal turtle traps in Georgia and said it was too hard to trap turtles because all the small turtles escaped from the legal traps.

Rodax Demo

  f. **HORTON** said that he had a contact in China and he was ordering thousands of nets for trapping turtles from the Chinese contact.

  g. **HORTON** said that he shipped all the turtles he caught to a person in California who exports them to China for the pet trade. HORTON said his contact in California paid him well for the turtles and "protected him."

26. On or about August 18, 2017, **HORTON** called the GA-DNR office and spoke to Special Permit Use Coordinator Jamie Hawkins. **HORTON** requested a Commercial Turtle Export Permit Application. Hawkins e-mailed **HORTON** the application to his e-mail address nhortonsr@gmail.com. Within an hour, Hawkins received four completed Commercial Turtle Export Permit Applications from **HORTON**, (demo) (demo). The four applications stated that a total of 404 turtles were being shipped on August 19, 2017, to (demo) via Southwest Airlines.

27. On August 20, 2017, according to surveillance footage and records obtained by law enforcement, (demo) dropped off five boxes of turtles at the Southwest Air Cargo Office at ATL. (demo) completed paperwork at the Southwest Air Cargo Office indicating that the turtles would be shipped on Southwest Airlines from ATL to LAX. The shipment was addressed to (demo) in Long Beach, CA and the shipment was charged to (demo) Southwest shipping account.

28. In LAX, that same day, on August 20, 2017, California Department of Natural Resources undercover officers observed and photographed (demo) and another individual receiving the shipment at the LAX-Southwest Air Cargo Office and taking the shipment to China Southern Airlines. FWS records show an export of turtles occurred from LAX

to Guangzhou, China, that day. The FWS export permit listed the U.S. exporter as (demo) Long Beach, CA 90805, with a contact e-mail (demo) The customs broker listed on the permit was (demo) FWS Wildlife Inspectors and Special Agents at the China Southern Airlines Cargo Office inspected the shipment prior to export and determined that thirty-nine turtles possessed matching PIT-tags to the turtles sold by law enforcement to **HORTON** on August 11, 2017. FWS agents also discovered the shipment destined for China contained 476 turtles, not the 404 declared to GA-DNR on the GA Export Permits that had been submitted by **HORTON**, (demo) The actual number of turtles for export, however, was within one of the amount listed on the FWS export permit.

29. On or about August 21, 2017, GA-DNR contacted **HORTON** regarding twenty-seven illegal turtle traps discovered on Lake Blackshear, located approximately 150 miles south of Atlanta, Georgia, in **HORTON's** (demo) (the traps had both individuals' names on the traps). The traps were illegal under Georgia law because the escape rings were fully-enclosed with extra fabric and zip ties.

30. On or about August 21, 2017, **HORTON**, (demo) were observed at the GA-DNR headquarters after being contacted by GA-DNR. GA-DNR explained to **HORTON**, (demo) that the turtle traps they were using were illegal because they had been modified and explained how to make their traps legal. GA-DNR seized all the traps and issued **HORTON** (demo) violation notices. Since **HORTON's** (demo) illegal turtle traps were discovered by law enforcement covering two counties, they were charged separately in Crisp and Sumter

Counties. **HORTON** (demo) each received fines of $3,025 in Crisp County with a court date of February 5, 2018. **HORTON** (demo) were also each fined $1351.35 in Sumter County with payment due March 8, 2018. As of mid-March, these two violation notices have not yet been resolved.

31. On or about August 23, 2017, **HORTON** (demo) were observed at the GA-DNR headquarters. (demo) met with Special Permit Use Coordinator Jamie Hawkins and obtained a non-resident GA Commercial Turtle Collecting Permit. On (demo) permit he listed his e-mail address as (demo) While (demo) obtained his permit, **HORTON** spoke with GA-DNR Cpt. Wade Law about his most recent violation notices from Lake Blackshear. Cpt. Law explained the turtle regulations to HORTON and explained why his turtle traps were illegal.

32. On or about September 7, 2017, GA-DNR received a Commercial Turtle Export Permit application from (demo) On the application, (demo) listed his e-mail address as (demo) also stated he was shipping turtles to (demo) at (demo) via Southwest Airlines on September 9, 2017. Southwest's records show that **HORTON** dropped off (demo) shipment at the ATL air cargo office on September 9, 2017 and the shipment was destined for LAX. This shipment was charged to Worldwide Trading Inc.'s account. FWS records show that a shipment of turtles was exported on September 10, 2017 from LAX to Guangzhou, China. The associated FWS export permit listed the (demo) (demo) Long Beach, CA 90805, as the US exporter for this turtle shipment. The e-mail address listed on the FWS export permit was (demo) The Customs Broker listed on the same permit was (demo)

(demo) with an e-mail contact of (demo) FWS Wildlife Inspectors and Special Agents at the China Southern Airlines Cargo Office inspected the shipment prior to export and discovered two PIT-tagged turtles that were sold by law enforcement to HORTON on August 11, 2017. FWS personnel also determined that the shipment from LAX to China contained 371 turtles, not 270 as declared to GA-DNR by (demo) on his GA Export Permit. The actual number of turtles for export, however, was within one of the amount listed on the FWS export permit.

33. On or about October 2, 2017, GA-DNR received a Commercial Turtle Export Permit application from (demo) On his application, (demo) listed his e-mail address as (demo) application stated that the turtles were being shipped on October 2, 2017 to (demo) Long Beach, CA from Charleston, SC, via Southwest Airlines. Law enforcement contacted Southwest Air Cargo in Charleston, SC and determined no turtle shipments had left from Charleston, SC between October 2 and 4, 2017. However Southwest Airlines' records do indicate **HORTON** dropped off (demo) shipment at its ATL air cargo office on October 4, 2017 and the shipment was destined for LAX. This shipment was charged to (demo) (demo) account. FWS records show that a shipment of turtles was exported on October 4, 2017 from LAX to Guangzhuo, China. The associated FWS export permit listed (demo) Long Beach, CA 90805, as the U.S. exporter for this turtle shipment. The e-mail address listed on the FWS export permit was (demo) The Customs Broker listed on the same permit was (demo) , with contact e-mail of (demo) FWS inspected the shipment and determined that it contained

276 turtles, not 90 as declared to GA-DNR by (demo) on his GA Export Permit. The actual number of turtles for export, however, was within one of the amount listed on the FWS export permit.

34. Based on my training and experience, I believe that the GA Export Permits prepared in connection with the shipments described in paragraphs 33, 36, and 37 listed an incorrect, and lesser, amount of turtles to make it appear that fewer turtles were being exported, thereby incurring less quota issues related to licensing with GA-DNR. I also believe that the FWS export permits listed the correct number of turtles (or within one turtle) because international shipments are more likely to be examined and there are no quota limits for the FWS.

35. On or about December 11, 2017, **HORTON** and (demo) brought (demo) (demo) to the GA-DNR headquarters and assisted him in obtaining a Commercial Turtle Permit. (demo) paid $55 cash for (demo) permit.

36. On or about December 18, 2017, GA-DNR received a Commercial Turtle Export Permit application from (demo) The application was sent from (demo) e-mail address, (demo) The application:

   a. Listed a shipment of 180 Loggerhead Musk turtles, 96 River Cooters and 28 Common Musk turtles (total number of turtles: 304);

   b. Stated that the turtles were being shipped on December 18, 2017 to (demo) (demo) Long Beach, CA via Southwest;

   c. Appeared fraudulent because it was originally signed by (demo) but (demo) name was crossed out and replaced with (demo) name

and the date appears to have been changed from December 11, 2017 to December 18, 2017.

37. Law Enforcement officers waited outside of the Southwest Air Cargo office in ATL and communicated with Southwest staff to see if when (demo) turtle would be dropped off on December 18, 2017 and December 19, 2017. Law enforcement saw no sign of (demo) or **HORTON** and Southwest records indicated no turtle shipments occurred on either date (December 18 or 19, 2017) (demo) permit expired on December 18, 2017, making any shipment after that date invalid as the permit was expired already. FWS records show that a shipment of turtles was exported on December 22, 2017 from LAX to Guangzhuo, China. The associated FWS export permit listed (demo) Long Beach, CA 90805, as the U.S. exporter for this turtle shipment. The e-mail address listed on the FWS export permit was (demo) The Customs Broker listed on the same permit was (demo) (demo) with contact e-mail of (demo) The FWS export permit listed the same species as (demo) permit from GA-DNR (Loggerhead Musk, Common Musk and River Cooters).[3]

---

[3] During 2015 and 2016, **HORTON** made arrangements with (demo) (demo) to catch and ship turtles to a different exporter in California, (demo) of (demo) In August 2016, GA-DNR discovered several illegal turtle traps belonging to (demo) in Cherokee County, Georgia. GA-DNR and FWS officers interviewed the (demo) and learned that they had been recruited into turtle trapping by **HORTON** in 2015. The (demo) stated that **HORTON** gave them 75 to 100 turtle traps and showed them how to trap turtles. **HORTON** also walked them through the process of obtaining a GA-DNR Commercial Turtle License and export procedures. HORTON gave the (demo) a price list of what prices his buyer, (demo) would pay for certain turtle species. Finally, **HORTON** told the (demo) to ship their turtles to (demo) in California. The (demo) stated that when they exported turtles to (demo) he would wire payment to **HORTON**, who would keep 65% of the sale price and give the (demo) The (demo) stated that they were aware of the turtle trap regulations and knew the traps **HORTON** provided them were illegal. The (demo) said **HORTON**

38. Pursuant to a grand jury subpoena, law enforcement obtained subscriber records pertaining to nhortonsr@gmail.com (demo) The listed subscribers are **NATHAN HORTON** and (demo) respectively.

39. Pursuant to a grand jury subpoena, law enforcement obtained subscriber records pertaining to (demo) The listed subscriber was (demo)

40. Based on the above information, there is probable cause to believe that **HORTON,** (demo) and others in the Northern District of Georgia and elsewhere, beginning in at least October 2016 and continuing until at least December 2017, violated the following provisions of federal criminal law: 16 U.S.C. § 3372 (a)(2)(A) (the Lacey Act), 18 U.S.C. §§ 2314 and 2315 (interstate transport and sale of stolen property), and conspiracy to violate the forgoing federal criminal statutes, in violation of 18 U.S.C. § 371.

## **CONCLUSION**

41. Based on the foregoing, I request that the Court issue the proposed arrest warrant for **NATHAN HORTON.**

---

told them if they were caught by GA-DNR they would only receive a small fine of $75.