IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>NATHAN HORTON | Criminal Action No.<br><br>1:20-CR-429-WMR |

**Sentencing Memorandum**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Alex Sistla and Samir Kaushal, Assistant United States Attorneys for the Northern District of Georgia, files this Sentencing Memorandum to assist the Court in resolving objections to the Presentence Investigation Report ("PSR") and sentencing the defendant, Nathan Horton.

**Introduction**

Nathan Horton stole hundreds of living, breathing, and thinking turtles from their native homes in Georgia state parks, threw them in boxes, and caused them to be shipped to China, earning himself immense profits while substantially harming Georgia's native turtle population. He did so using illegal traps that lacked a legally required escape ring to prevent the drowning of aquatic animals and birds. Those traps did not give the turtles even a puncher's chance of escaping his greedy hands.

The Court should sentence Horton to a meaningful term of imprisonment at the low-end of the advisory Guidelines range, while applying enhancements for the market value of turtles being between $150,000 and $250,000 and aggravating role. To adequately deter him and others from this egregious conduct in the future, the Court should also: (i) impose a meaningful fine; (ii) order Horton to complete at least 150 hours of community service; and (iii) bar Horton from trapping turtles for the entirety of his term of supervised release.

## Discussion

### A. A conservative estimate of the market value of the illegally trapped turtles is between $150,000 to $250,000.

Horton regularly used illegal traps to capture turtles. (PSR ¶¶ 15 ("They identified the defendant as someone who used an illegal net to collect turtles[.]"), 20 ("When asked to see one of the traps they had on the boat, the defendant handed one of the small traps, and the official explained it was illegal[.]"), 30 (explaining that Horton said he had illegal traps), 33 ("The trap the defendant described was illegal in the State of Georgia because although it has a 10-inch ring, fish and turtles could not escape because of the one-way funnel mesh facing into the trap."), 42 (referring to Horton's use of 27 illegal traps), 100 ("The defendant instructed B. Martin to buy the traps which had no escape rings which were the same type as the first thirty traps the defendant supplied the Martin family with."). Horton used the illegal traps

because there is no way he could capture hundreds of turtles in the time frames he caught them without traps that gave the turtles essentially no chance of escape. (*See id.* ¶¶ 20 ("The defendant replied if they used traps with the larger throats and rings, the small turtles would escape."), 99 ("You don't want those traps. You won't catch any turtles with those."), 101 ("Look at it this way. You're making thousands of dollars trapping turtles, right? Would you worry about a $75 ticket?").)

The illegal turtle traps yielded Horton significant profits. Bank records for Horton's Wells Fargo Bank account ending in 4246 show that from April 13, 2016, through October 2, 2017, Ryan Hsieh, the owner of Worldwide Trading Inc., paid Horton $251,000 for turtles.

| TRANSACTION DATE | SOURCE OF DEPOSIT | DEPOSIT AMOUNT |
|---|---|---|
| 04/13/16 | Worldwide Trading Inc. (Bank of America 8088) | $20,000.00 |
| 08/03/16 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 08/18/16 | Worldwide Trading Inc. (Bank of America 8088) | $2,000.00 |
| 08/23/16 | Worldwide Trading Inc. (Bank of America 8088) | $2,000.00 |
| 08/30/16 | Worldwide Trading Inc. (Bank of America 8088) | $1,000.00 |
| 09/07/16 | Worldwide Trading Inc. (Bank of America 8088) | $10,000.00 |
| 09/27/16 | Worldwide Trading Inc. (Bank of America 8088) | $1,000.00 |
| 10/13/16 | Worldwide Trading Inc. (Bank of America 8088) | $14,000.00 |
| 10/18/16 | Worldwide Trading Inc. (Bank of America 8088) | $20,000.00 |
| 01/06/17 | Worldwide Trading Inc. (Bank of America 8088) | $500.00 |
| 02/23/17 | Worldwide Trading Inc. (Bank of America 8088) | $1,000.00 |
| 03/03/17 | Worldwide Trading Inc. (Bank of America 8088) | $4,000.00 |
| 03/07/17 | Worldwide Trading Inc. (Bank of America 8088) | $1,500.00 |
| 03/08/17 | Worldwide Trading Inc. (Bank of America 8088) | $4,000.00 |
| 03/23/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 03/30/17 | Worldwide Trading Inc. (Bank of America 8088) | $10,000.00 |
| 04/05/17 | Worldwide Trading Inc. (Bank of America 8088) | $10,000.00 |

| TRANSACTION DATE | SOURCE OF DEPOSIT | DEPOSIT AMOUNT |
|---|---|---|
| 04/10/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 04/12/17 | Worldwide Trading Inc. (Bank of America 8088) | $4,000.00 |
| 04/17/17 | Worldwide Trading Inc. (Bank of America 8088) | $10,000.00 |
| 04/19/17 | Worldwide Trading Inc. (Bank of America 8088) | $10,000.00 |
| 04/26/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 05/01/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 05/04/17 | Worldwide Trading Inc. (Bank of America 8088) | $25,000.00 |
| 05/16/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 05/22/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 05/30/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 06/05/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 06/08/17 | Worldwide Trading Inc. (Bank of America 8088) | $3,000.00 |
| 06/12/17 | Worldwide Trading Inc. (Bank of America 8088) | $3,000.00 |
| 06/14/17 | Worldwide Trading Inc. (Bank of America 8088) | $3,000.00 |
| 06/21/17 | Worldwide Trading Inc. (Bank of America 8088) | $20,000.00 |
| 07/17/17 | Worldwide Trading Inc. (Bank of America 8088) | $10,000.00 |
| 07/20/17 | Worldwide Trading Inc. (Bank of America 8088) | $5,000.00 |
| 07/26/17 | Worldwide Trading Inc. (Bank of America 8088) | $3,000.00 |
| 08/10/17 | Worldwide Trading Inc. (Bank of America 8088) | $2,000.00 |
| 09/18/17 | Worldwide Trading Inc. (Bank of America 8088) | $6,000.00 |
| 10/02/17 | Worldwide Trading Inc. (Bank of America 8088) | $1,000.00 |
| | **TOTAL** | **$251,000.00** |

The government's estimated market value of between $150,000 to $250,000 generously focuses solely on the business relationship between Horton and Hsieh, instead of identifying every vendor to whom Horton sold turtles, and discounts the $1,000 that would result in an additional two offense levels, giving some credit to Horton's claim—which is unsupported by the evidence— that he sometimes did not use illegal traps.

Horton's bank records—not the turtle permits or export permits as Horton suggests in his PSR objections—are the best estimate of the turtles' market value because they show the actual payments he

received for the turtles. The permit information, on the other hand, was manipulated to list other peoples' names and the other information reported in the permits was not necessarily correct. (*See, e.g.*, PSR ¶¶ 55, 72, 82, 84.)

Turning to the Probation Office's estimate, its estimate of the market value is not unreasonable given Horton's description of his employment and his use of illegal traps. According to Horton, for ten years, from 2009 to 2019, he was, a "full-time . . . exotic wildlife collector who sold to wholesalers[.]" (*Id.* ¶ 161.) Because Horton's traps were illegal, looking at all the payments coming into Horton's bank account plus other income he reported, as the Probation Office did, is a fine estimate of Horton's unlawful gains, albeit slightly more aggressive than the government's estimate, which gives Horton the benefit of every doubt.

When comparing Horton's proposed range of $95,000 to $150,000, to the evidence, that estimated market price materially understates his gains when looking at the bank records or even Horton's own estimates of his profits. Horton estimated his profits to be "approximately $60,000 per year over the course of five years," meaning that he earned about $300,000. (*Id.* ¶ 73.)[1]

---

[1] Due to the complexity of the exercise and to provide Horton with every benefit of the doubt on market value, neither the government's nor the Probation Office's estimates account for the fair market retail price of the turtles when they were sold in China. *See* USSG § 2Q2.1 app. n.4 (directing

## B. Horton should receive a four-level aggravating role enhancement.

Under the Sentencing Guidelines, a defendant's base offense level increases by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" U.S.S.G. § 3B1.1(a). The government bears the burden of proving the existence of the defendant's aggravating role by a preponderance of the evidence. *United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018). The following factors are relevant to the application of the role enhancement:

> (1) the exercise of decision-making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*Id.* The enhancement applies where, for example, "there was evidence that the defendant had recruited participants, had instructed participants, or had wielded decision-making authority." *United States v. Caraballo*, 595 F.3d 1214, 1231 (11th Cir. 2010); *United States v.*

---

that the fair market retail price should be used when possible). For the sellers in China to earn profits, the fair market retail price in China must necessarily exceed the prices at which the turtles were bought and sold in the United States.

*Ndiaye*, 434 F.3d 1270, 1304 (11th Cir.2006) (affirming role enhancement where defendant "exercised authority over the organization by recruiting and instructing co-conspirators"); *United States v. Suarez*, 313 F.3d 1287, 1294 (11th Cir. 2002) (affirming role enhancement where defendant gave orders to other agents, oversaw the movement and distribution of illegal drugs, and possessed decision-making authority); *United States v. Mesa*, 247 F.3d 1165, 1168–69 (11th Cir.2001) (affirming role enhancement where defendant "controlled and directed" others in the transportation of illegal drugs and claimed a larger share of the profits than other participants).

Here, it is undisputed that Horton controlled at least seven participants: Roger Costigan, Alex Heriard, Samuel Floyd, Javontae Crowell, Jarquise Adams, Brad Martin, and Caius Martin. (PSR ¶¶ 23–24 (explaining that Horton brought Costigan and Adams to the GA-DNR headquarters to obtain a turtle permit), 25 (explaining that Costigan brought Heriard to GA-DNR headquarters to obtain a turtle permit), 26 (listing Adams's and Heriard's names on export permits), 32 (attempting to recruit undercover officials), 37 (listing Floyd's, Costigan's, and Heriard's names on export permits), 51 (explaining that Horton and Costigan brought Crowell to the GA-DNR headquarters to obtain a turtle permit), 52 (listing Crowell's name on export permit), 72 (Horton admitting that he directed others), 82 (recruiting Adams), 83 (listing Adams's name on export permit), 87 (recruiting Crowell), 90–

7

102 (discussing recruitment and direction of Brad Martin and his sons), 95 (explaining that Horton would receive 60 percent of proceeds for turtles trapped by Brad Martin and his sons).

During an interview with law enforcement. Costigan provided insight into Horton's operation. Horton hired Costigan in 2017 to serve as an "assistant" and paid him approximately $1,000 per week. (PSR ¶¶ 77–78.) According to Costigan, Horton was "in full control of business-related decisions"; "handled all financial transactions"; "owned all the equipment involved," including the turtle traps; and "directed all activities involved with obtaining turtles." (*Id.* ¶ 78.) Costigan further explained that Horton directed him to submit export permits and to deliver turtles shipments to the airport. (*Id.* ¶¶ 79–81.)

Based on these facts, Horton should receive a four-level aggravating role enhancement because he was the leader of a scheme involving five or more participants and the criminal activity was otherwise extensive. *See* USSG § 3B1.1(a). Horton's scheme plainly involved five or more participants. *See id.* And, even if it did not, his criminal activity was "otherwise extensive" under § 3B1.1(a). Factors relevant to the extensiveness determination, include "the length and scope of the criminal activity as well as the number of persons involved." *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994)*; cf. United States v. Sosa*, 777 F.3d 1279, 1301–02 (11th Cir. 2015); *United States v. Rodriguez*, 981 F.2d 1199, 1200 & n.3 (11th Cir. 1993). According to the

commentary for § 3B1.1, sentencing courts should consider "all persons involved during the course of the entire offense," including outsiders who unknowingly provided services. USSG § 3B1.1 cmt. n.3. So, for example, "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.* "[N]o set number of criminally responsible participants is required" for criminal activity to be extensive, except that there must be at least one "participant" other than the defendant. *Holland*, 22 F.3d at 1045 & n.8. Here, Costigan was undeniably a participant in the criminal scheme. (*E.g.*, PSR ¶¶ 77–81.) The turtle and export permits needed to hide and delay detection of Horton's criminal conduct and the number of individuals recruited by Horton add to the extensiveness of the scheme—a scheme that lasted for years and significantly damaged the native loggerhead musk turtle population of the State of Georgia.[2] The

---

[2] The Georgia Department of Natural Resources victim impact statement describes the horrifying consequences of Horton's conduct:

> Mr. Horton is reported to have trapped an area for turtles until the local population was completely exhausted. Based on the average population density of loggerhead musk turtles in the wild, collecting 3,000 turtles (valued @ $225,000) of this species would be the equivalent of trapping to extirpation a 31-mile stretch of a 24-foot-wide river (the width of a two-lane highway).

The statement goes on to explain that it would take at least 14 years for the turtle population to recover.

disposition of the turtles in China, which required shipments from
Georgia to Hsieh in California and then California to China, also
contributed to the extensive nature of this scheme.

### C. The Court should impose punishment beyond a term of imprisonment.

Lacey Act violations are not uncommon. But Horton's criminal
conduct was in terms of scale and impact. Hundreds of turtles over
months of illegal trapping. Layers of misleading and false permitting
paperwork. Shipments of turtles to California for later shipment to
China. Thousands of dollars in ill-gotten gains. On these facts, a term
of imprisonment is insufficient to achieve general and specific
deterrence. As such, Horton's sentence should include other forms of
punishment. First, Horton should be ordered to pay a meaningful fine.
Horton received thousands of dollars for illegally trapping turtles and
believed that it made financial sense for him to do so. (PSR ¶ 101
("Look at it this way. You're making thousands of dollars trapping
turtles, right? Would you worry about a $75 ticket?").) Justice requires
that he pay a within-Guidelines fine that penalizes him for this illegal
activity. Otherwise, the financial incentives to commit crimes like
Horton's will be too great. Second, because Horton pilfered public lands
that were meant for the enjoyment of everyone, he should be required
to perform community service. Third, Horton should be barred from
trapping turtles or accompanying any other person trapping turtles for

the entirety of his time on supervised release. *E.g.*, *United State v. Campbell*, 6:19-cr-00400 (D. Or. Nov. 23, 2020) (Doc. 46) (including a special condition of supervised release stating: "You must not fish, angle or hunt in the United States. You must not possess any fishing poles, fishing tackle, guns, bows or any other hunting equipment. You must not accompany any other person in the United States while they are fishing, angling, or hunting.").

.

Respectfully submitted,

RYAN K. BUCHANAN
   *United States Attorney*


/s/ ALEX SISTLA
   *Assistant United States Attorney*
   Georgia Bar No. 845602
   Alex.Sistla@usdoj.gov


/s/ SAMIR KAUSHAL
   *Assistant United States Attorney*
   Georgia Bar No. 935285
   Samir.Kaushal@usdoj.gov

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Thomas Hawker

Attorney for Defendant Nathan Horton

May 5, 2022

/s/ SAMIR KAUSHAL

SAMIR KAUSHAL

*Assistant United States Attorney*