IN THE UNITED STATES DISTICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 1:20-CR-429-WMR-CMS |
| v. | |
| NATHAN HORTON | |

## SENTENCING MEMORANDUM

COMES NOW, the Defendant, NATHAN HORTON ("Mr. Horton"), by and through undersigned counsel, and files this sentencing memorandum in support of a reasonable sentence.

### I.   PRELIMINARY STATEMENT

Mr. Horton pled guilty to one count of purchasing 46 turtles sold to him by an undercover U.S. Fish and Wildlife Service (USFWS) agent believing them to have been caught in non-compliant nets. Unbeknownst to him, this violated a federal law, the Lacey Act, a broad statute which extends the power of the federal government to local violations of fish and wildlife regulations. He accepted responsibility for his crime. Now, the PSR attempts to expand the scope of his misdeeds, reaching back years to claim that every dollar he made from operating a commercial wildlife business was dirty. This is a step too far.

Mr. Horton accepts responsibility for his crime and even his flawed business practices which ran afoul of GA-DNR regulations which restrict the number of turtles an individual can catch and export to domestic buyers. The Court should hold him accountable for the value of *that* wildlife. Mr. Horton was not the mastermind of a criminal enterprise. He was a wildlife enthusiast and trapper, making a living the only way he knew how. He has no criminal history. Mr. Horton has been on pretrial release for three years and is a productive citizen, working, and supporting himself and his family. He asks the Court to take all of this into account at sentencing, and to impose a sentence which allows for alternatives to incarceration in a federal prison.

## II.    FACTUAL BACKGROUND

Almost three years ago, Mr. Horton was arrested for violating Georgia DNR's turtle trapping regulations. Because his business was to ship wildlife out of state to domestic buyers, it became a federal case under the breathtakingly broad Lacey Act, which, among other things, prohibits the receipt or transportation of wildlife taken in violation of state law or regulation. *See* 16 U.S.C. §§ 3372(a), 3373(d).  Specifically, Mr. Horton pled guilty to one count of buying 46 turtles from an undercover U.S. Fish and Wildlife Service agent believing the agent

caught the turtles with nets that did not meet Georgia's regulatory requirements.[1] During that undercover sale, on August 11, 2017, Mr. Horton told the agents, on video, that their nets were non-compliant and even offered to provide them with nets he believed were legal which he had ordered from China and expected to receive any day. Mr. Horton knew the agent's nets were non-compliant because he had been cited by GA-DNR for using similar nets the year before. He had no idea that purchasing the turtles which *he* did not catch was somehow unlawful.[2]

GA-DNR and USFWS had been investigating Mr. Horton due to suspicions that he was violating state regulations relating to his turtle trapping. Specifically, officials believed he was using non-compliant traps and exceeding quota limits with his exports of certain turtle species from Georgia. Mr. Horton had a business trapping and selling turtles. It is legal to do this if one complies with state regulations. Mr. Horton always had a valid commercial trapping permit and tagged his traps with his name and permit number when on the water. That said, Mr. Horton was cited, for the first time, on October 18, 2016 while turtle trapping

---

[1] Of course, USFWS agents did not *actually* catch the turtles with noncompliant traps but only *represented* that they did by showing Mr. Horton bad nets. That is why Mr. Horton pled to an attempt offense.

[2] To violate the Lacey Act, however, a person does not have to violate the predicate regulation himself but only needs to have knowledge it was violated or, in this case, *believe* it was violated. *United States v. Mitchell*, 985 F.2d 1275, 1284 (4th Cir. 1993) (finding it unlawful to acquire and transport wildlife someone else hunted unlawfully).

on Lake Jackson, in Georgia, with his brother, Richard Frank. The GA-DNR officer told him his nets were too small. After that, Mr. Horton made efforts to comply, even if he may have fallen short of GA-DNR regulations which are not a model of clarity.

There is no objective data available to conclude that a given shipment of turtles was caught and exported using nets which Mr. Horton knew to be illegal yet nevertheless still used. However, there is data indicating the quantity and species of turtles which Mr. Horton exported from Georgia during 2016 and 2017. These numbers can be seen on the export permits which the government produced in discovery for a twenty-month period, from April 2016 to December 2017. No other permits were provided. These figures allow for an analysis of the extent which Mr. Horton may have exceeded his quotas and therefore the value of wildlife at issue beyond the undercover sale.[3]

During the undercover sale, on August 11, 2017, Mr. Horton told the USFWS agent that his business model included obtaining commercial turtle permits for others (and therefore access to their quotas) to increase the quantity of turtles he

---

[3] As Mr. Horton explained in his PSR objections, the Court should determine the value of the wildlife which Mr. Horton is responsible for by looking to the Georgia export *permits*, specifically the species and numbers listed on those permits that he exported in excess of legal limits. It is not possible to draw useful conclusions from looking at potential inconsistencies in a handful of inspected shipments. (See PSR at ¶¶ 26-28, 37-45).

could ship. Mr. Horton expressed his belief to the agent that this aggressive business practice was legal. (PSR at ¶ 32). After reviewing the GA-DNR regulations, however, Mr. Horton accepts that this practice was flawed. Where Mr. Horton ran afoul is that he was "taking" those turtles from the Georgia waters in excess of what he *personally* could take, as those individuals were not trapping.

Because these individuals did not trap and "take" the turtles themselves, Mr. Horton could not use their quotas to catch and then export those turtles. More specifically, Regulation 391-4-16-0.5(1) provides that any person possessing a commercial turtle permit "may not *take* the following species in number greater than the respective limit on an annual (i.e. April 1 – March 31) basis." (emphasis added). Loggerhead Musk and Common Musk were both limited to 300 per person per year. It is the "taking" of turtle species from Georgia waters in excess of one's personal limits that is unlawful, not the export. Accordingly, where Mr. Horton procured permits for folks who did not themselves trap, and then caught *their* turtle limits, he was "taking" in excess of his personal annual limits. It is important to point out, however, that Mr. Horton did not do this for everyone listed on the export permits produced by the government. Some trapped themselves and Mr. Horton exported to buyers with whom he had relationships. Others caught and exported on their own, without his involvement. Those

numbers should not be used to calculate the value of wildlife attributed to Mr. Horton.

Where Mr. Horton exceeded an annual quota for a particular species by procuring permits for others who did not trap, he agrees that the value of that wildlife should be counted against him in this case. These amounts are significantly less than what the PSR finds as the value of the wildlife at issue here. So too, Mr. Horton disagrees that he should receive a 4-level leadership increase because he recruited others to obtain commercial turtle permits. (PSR at ¶ 111). These individuals are not criminally responsible.

## III.   ARGUMENT

The statutory sentencing factors under 18 U.S.C. § 3553(a) weigh heavily in favor of a sentence which considers alternatives to incarceration. Mr. Horton has been on bond for almost <u>three</u> years working stable warehouse and distribution center jobs at large companies such as Amazon and Food Lion. These are the first wage-earning jobs he has actually ever held. Previously, all he knew was the lifestyle of collecting and trading in wildlife, largely due to being forced from his home due to a very difficult upbringing. He made ends meet through his love of wildlife and nature. Nevertheless, now, having experienced something new, he has no intention or desire to return to the unstable and very difficult life of trapping and trading in wildlife to survive.

6

### A.   The Guidelines

The advisory Guidelines range is one of several statutory factors which the Court is to consider. There are two guideline issues which the Court needs to address before calculating the advisory range and imposing sentence in this case. Mr. Horton will address each in turn.

### *Market Value of Wildlife (PSR at ¶ 109).*

First, under U.S.S.G. § 2Q2.1(b)(3)(A), the Court should determine the market value of the wildlife at issue. That section provides that if the market value of the wildlife "exceeds $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount." U.S.S.G. § 2Q2.1(b)(3)(A)(ii). "Market value" is defined as the fair-market retail price. *Id*. at Application Note 4. But first, the Court must identify the wildlife at issue. To do this, as mentioned above, the export permits should be consulted. Again, these contain the only reliable record of what was exported and therefore the value of the turtles in excess of quota limits for those years.

To make a calculation based upon the data provided, Mr. Horton has prepared an exhibit which consists of a table outlining the export permits by date, number of turtles, and species, as well as the permit customer and buyer. It is attached to this memorandum as Exhibit 1. Mr. Horton is not aware of any species other than loggerhead musk and common musk for which he exceeded annual

quota limits by exporting turtles from Georgia. Accordingly, Mr. Horton has limited his calculation to those species. The chart below captures the calculations which can be used to find the value of wildlife in this case:

*Loggerhead Musk*
*2016-2017*

| | |
|---|---|
| Loggerhead Musk Total Exported | 5,952 |
| Robert Odom, Neva Odom, Johnny Odom | - 1,601 |
| Phillip Frank, Richard Frank, and Josiah Hemm | - 630 |
| Nathan Horton's Personal Allowance | - 600 |
| **Total Loggerheads Assigned to Mr. Horton in Excess of Annual Quota** | **<u>3,121</u>** |

*Common Musk*
*2016-2017*

| | |
|---|---|
| Common Musk Total Exported | 743 |
| Nathan Horton's Personal Allowance | -600 |
| Neva Odom | -4 |
| Phillip Frank, Richard Frank, and Josiah Hemm | -28 |
| **Total Common Musk Assigned to Mr. Horton in Excess of Annual Quota** | **<u>111</u>** |

Both of these charts take the total number of turtles exported and subtract the export numbers for those who (1) trapped and exported themselves or (2) trapped and Mr. Horton exported for them. He did not solicit these individuals to

obtain commercial turtle permits. They trapped on their own. Their numbers should not count against Mr. Horton. In addition, Mr. Horton subtracted the annual limits he was allowed for each of the two species, 600 turtles (300 per year) for the two years where data exists.

This calculation is conservative by erring on the side of overinclusion. More specifically, the calculation includes Roger Costigan and Ryan Hsieh, as well as Brad Martin and Caius Martin. It is beyond dispute that these individuals were actually involved in trapping. Further, the export permits reflect that they did not exceed their quotas in a given year. It is not unlawful to operate a commercial turtle trapping enterprise which pools the permit quotas of those actively trapping who obtain permits and do not exceed their quotas. However, to eliminate any argument by the government that these individuals *should* count against him due to their close business relationship, Mr. Horton's has calculated the value of wildlife by including their exports.[4]

Mr. Horton sold loggerhead musk turtles for an average of $35 per turtle. Of course, the price varied depending upon the size. He sold common musk turtles for an average of $5 per turtle. Indeed, on August 11, 2017, Mr. Horton purchased 21 loggerhead musk turtles from the undercover USFWS agent for $20 per turtle,

---

[4] Mr. Horton does not agree that these individuals are criminally responsible for a Lacey Act or other offense so as to justify a leadership increase being applied to him.

and he paid $3 per turtle for the 20 common musk he bought. The average price he received from buyers, $35 per loggerhead, represents a 75% mark-up from the $20 price he paid to the undercover agent. Using a $5 per turtle market price allows for a 67% mark-up from the $3 he paid the undercover agent for common musk turtles. Using these figures, the market value of the turtles which exceeded Mr. Horton's quotas is:

| Loggerhead Musk | 3,121 x $35 = $109,235 |
| Common Musk | 111 x $5 = $555 |
| **Total** | **$109,790** |

Of course, this is the best estimate available given the data provided. This amount corresponds to an 8-level increase under § 2B1.1, not a 12-level increase based upon raw bank records – the overly broad measure used by the PSR. (*See* PSR at ¶ 109).

### *Aggravating Role (PSR at ¶ 111)*

The final PSR adopts the government's objection which asked for a 4-level increase based upon the argument that Mr. Horton was an organizer and leader of criminal activity which involved five or more participants. (PSR at ¶ 111). The initial PSR did <u>not</u> apply any adjustment for role in the offense. In its objection, the government offered no new facts or information in support of its objection. Rather,

it simply pointed to the initial PSR which again did not find the adjustment, stating:

> The PSR identifies at least eight individuals involved in the criminal activity: Nathan Horton, Roger Costigan, Ryan Hsieh, Alex Heriard, Javontae Crowell, Jarquise Adams, Brad Martin, and Caius Martin. Every single person, except for Ryan Hsieh, reported to or was recruited by Horton.

(Government Objections, p. 1).

U.S.S.G. § 3B1.1(a) provides: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The government and PSR relies on their being five or more "participants." The application notes define participant:

> A **"participant"** is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.

U.S.S.G. § 3B1.1, Application Note 1.

Only Mr. Horton and USFWS agents were involved in his August 11, 2017 purchase of the 46 turtles which were represented as having been caught with non-compliant nets. That is the offense to which Mr. Horton pled. There were no other participants. Next, with respect to the other seven individuals the government lists as criminally responsible, each had a business relationship with Mr. Horton in the past but none are criminally responsible for the commission of an offense. In fact,

it is unclear what "criminal activity" the government contends that the other seven individuals are responsible for.

Alex Heriard, Javontae Crowell, and Jarquise Adams obtained commercial turtle permits. Even if solicited by Mr. Horton, their involvement began and ended there. There are no facts to show that any of these individuals had knowledge of any GA-DNR regulation or law as it relates to the permit process, quotas, or any matter relating to the trapping and export of turtles. There is certainly no information to conclude that any of these individuals believed they could not obtain a permit and assign it to Mr. Horton for a fee. They are not criminally responsible for the commission of an offense and thus not "participants."

Brad Martin and his son, Caius Martin, obtained their own permits and trapped. They entered into a business relationship with Mr. Horton and he introduced them to buyers in California. (See PSR at ¶¶ 90-97). They would also ship their own turtles. (Id.). A review of their interviews belies the notion that they are criminally responsible for an offense. (*See* PSR at ¶¶90-102).

Even those more closely connected to Mr. Horton's business, namely Roger Costigan and Ryan Hsieh, in their interviews, describe a working business relationship. Mr. Hsieh was an arms-length buyer who claims that Mr. Horton still owes him money. (PSR at ¶ 75). Mr. Costigan was an assistant whom Mr. Horton regularly paid for his work, which included trapping. (Id. at ¶ 78). Like the

Martins, both trapped with commercial turtle permits which they obtained. Without more, it is unclear how either is criminally responsible for Mr. Horton's business model or a violation of the Lacey Act. There is no indication that either has a clear understanding of Georgia's regulatory requirements such that they had criminal intent. There are simply not five criminally responsible participants justifying a 4-level increase. There is only one – Mr. Horton. A role enhancement is not justified.[5]

A proper calculation of the Guideline range is:

**Base Offense Level**     **6**

**Pecuniary Gain**     **2**

**Market Value of Wildlife**     **8**

**Total**     **16**

**Acceptance of Responsibility**   **-3**

**Adjusted Level**     **13**

With a criminal history category of I, Mr. Horton's advisory range is 12-18 months, falling in Zone C. The guidelines themselves recommend alternatives to incarceration in this zone.

---

[5] Again, Mr. Horton, to be conservative, has included the exports in the names of these individuals as part of the value of wildlife calculation. This does not mean, however, that these individuals are criminally responsible.

**B.      The Sentence in This Case Should Include Alternatives to Incarceration.**

Mr. Horton is asking the Court to impose either a sentence of probation with home confinement or a split sentence which substitutes home confinement for a portion of the time which would otherwise be served in federal custody. These options honor the guidelines and § 3553.

More and more, the U.S. Sentencing Commission is attempting to refine an approach that is less rigid and more attuned to individual cases. In 2018, the Sentencing Commission amended the guidelines to expand the circumstances where no imprisonment is officially suggested. On November 1, 2018, the commentary to U.S.S.C. § 5C1.1, entitled "Imposition of a Term of Imprisonment," was amended in a way which demonstrates a recognition by the Commission that incarceration is not always the answer. Specifically, Application Note 4 now provides: "If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of incarceration. . . ." U.S.S.G. § 5C1.1, Application Note 4. This application note recommends probation without any condition requiring community or home confinement for folks in Zones A or B that have little-to-no criminal history.

The Commission explained the amendment as being consistent with the statutory language in 28 U.S.C. § 994(j) regarding the "general appropriateness of

imposing a sentence other than imprisonment" for a first offender who has not been convicted of a violent offense. U.S.S.G. § 5C1.1, Amendment 811 (November 1, 2018). The Commission also noted that the change is consistent with a recent recidivism study conducted by the U.S. Sentencing Commission which demonstrated that offenders with zero criminal history points have a lower recidivism rate than offenders with one criminal history point, and that offenders with zero criminal history points and no prior contact with the criminal justice system have an even lower recidivism rate. *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Com'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6-9 (2017). *Id*.

To be clear, Zones A and B cover advisory ranges extending from 0 months, where the criminal history category is low, to as high as 15 months, where the offender has more criminal history. *See* U.S.S.G. at Sentencing Table. Accordingly, even within the higher ranges of Zone B, where more criminal history is involved (and the range is as high at 15 months), the guidelines provide the option of alternative sentencing, i.e., probation that includes a term of community or home confinement. U.S.S.G. § 5C1.1(c)(3). Of course, Zone C, which covers ranges from 10-18 months, allows for split sentencing involving home or community confinement as a term of supervision. *See* U.S.S.G. § 5C1.1(d)(2). And, Zone D still

provides that a "guideline" sentence is confinement for the period called for in the Sentencing Table. U.S.S.G. § 5C1.1(f).

Again, regardless of zone, the guidelines are advisory, and the Court has the discretion to fashion any sentence, including straight probation, which is authorized by the governing statutes. See 18 U.S.C. § 3561(a) (probation option). That option exists here. Thus, it makes even more sense, in light of the Sentencing Commission's most recent statement on incarceration for low level offenders, to meaningfully examine all viable options for defendants with no criminal history points but who nevertheless fall into Zones C or D.

Here, Mr. Horton has zero criminal history points in his 37 years of life. He is certainly a non-violent first offender. Given this, he does not present a risk of recidivism. Moreover, a proper guidelines calculation places him in Zone C, which suggests alternatives to incarceration as a *guideline* sentence. For the past three years, Mr. Horton has shown his ability to abide by conditions of release and supervision by U.S. Probation. All the while, he has been a productive, law-abiding member of society. That should not change.

### C.   Mr. Horton's Personal History and Characteristics Support Alternatives to Incarceration.

Many times, technical applications of the guidelines result in a range which overstates a defendant's culpability or the scope of the offense. Regardless, the Court is to weigh the remaining § 3553 factors to arrive at a reasonable sentence.

Those factors, including Mr. Horton's personal history and characteristics, weigh in favor of a sentence with alternatives to incarceration.

Since his release on August 29, 2019, the day of his arrest, Mr. Horton has worked various positions at Amazon and Food Lion, some of which involved significant responsibilities. These were the first wage-earning jobs for Mr. Horton. He had always trapped, collected, and traded wildlife, having learned from his stepfather. (PSR at ¶¶ 130, 131). He developed a love for it and it was how he tried, although unsuccessfully, to bond with his stepfather. Ultimately, collecting and trapping wildlife was how Mr. Horton lived and survived, having fled an abusive home at age 15. (PSR at ¶¶ 130-139).

During the past three years, Mr. Horton has lived at the same stable residence in Orangeburg, South Carolina with a friend. (PSR at ¶ 147). He no longer deals with wildlife. And, he has no plans to do so in the future. Now, having seen a different life, with a stable residence and job, he wants more for himself and his son, six-year old Nathan Jr, who lives with his mother in South Georgia. For the past three years, Mr. Horton life has focused on stability and earning a regular wage, a different life.

During his time on bond, Mr. Horton has worked relentlessly. Soon after his release, in 2019, he landed a job at an Amazon distribution center near Orangeburg. Initially, he worked as a warehouse associate, walking through the

17

massive warehouse and hand picking orders for customers in totes. Soon, he was advanced to work in the Amazon Fulfillment Engine (AFE) area of the center. This is where thousands of totes containing orders flow on a conveyor beltline for scanning and further processing prior to distribution. Nathan worked as a process guide, utilizing a tablet and central computer to monitor the volume of work and workflow. Although he was making the same hourly wage, the level of responsibility was akin to that of an assistant manager. After another job in the AFE, where he was responsible for problem solving orders that were not tracking or which were missing, he moved to the ship dock. His shift was always at night, from 6:30 p.m. to 5:00 a.m.

In the ship dock, Mr. Horton took on even more responsibility, serving as a shipping clerk. There, he was responsible for managing drivers and shipments and monitoring work flow through the Amazon computer system. He was tasked with monitoring daily volume at each shipping bay. Basically, Mr. Horton was involved in tracking, organizing, and coordinating the packages, drivers, labor, and volume leaving the building.

Mr. Horton worked at Amazon for 16 months. It could be a difficult and stressful job, especially during peak seasons and also working the night shift. In March of 2021, Mr. Horton decided to take a job at Food Lion in their warehouse. He worked there from March of 2021 to February of 2022. There, Mr. Horton

worked as an order selector, building pallets containing products which were shipped to various Food Lion grocery stores. After a year at Food Lion, Mr. Horton decided to return to Amazon, where he is currently employed.

Mr. Horton has had three years of stable, wage-earning work and a permanent address. By contrast, his past lifestyle consisted of constant movement, temporary living arrangements, and a subsistence income based upon his wildlife business. (See PSR at ¶ 146). Collecting and trapping wildlife were the only things he truly learned from an abusive stepfather. It is what he knew how to do to survive after he fled the home at age 15. That was then. Now, he is happy with his new life and ready to move forward.

After this case, Mr. Horton becomes a felon. He loses valuable civil rights and will likely suffer collateral consequences, such as potential barriers to employment. This is not insignificant for a person who has never been convicted of a crime. Moreover, he has been monitored and supervised by U.S. Probation for three years while this case is pending and will be monitored for years to come. A sentence which includes home confinement or a limited split sentence of incarceration followed by home confinement would respect the law, reflect the seriousness of the actual offense, and serve as just punishment, particularly in light of the person, his human failings, and the crime.

Respectfully submitted, this 5th day of May, 2022.

*/s/ Thomas L. Hawker*
THOMAS L. HAWKER
Georgia Bar No. 338670
Attorney for Nathan Horton

FEDERAL DEFENDER PROGRAM, INC.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, GA 30303
(404) 688-7530/Fax (404) 688-0768
Thomas_Hawker@fd.org